1
2
3
4
5
6
7

**IN THE UNITED STATES DISTRICT COURT**

8

**FOR THE DISTRICT OF ARIZONA**

9

**LAURA J. KOLEP,**                              )

10

           **Plaintiff,**     )   **CV 04-00706-TUC-CKJ [CRP]**

                                 )

11

**vs.**                                          )   **REPORT AND RECOMMENDATION**

                                 )

12

**JO ANNE B. BARNHART,**                         )

                                 )

13

           **Defendant.**    )

_____ )

14

15        Plaintiff Laura J. Kolep has filed the instant action seeking review of the final decision

16  of the Commissioner of Social Security, pursuant to 42 U.S.C. §405(g).  This Social Security

17  Appeal has been referred to the United State Magistrate Judge pursuant to the Rules of

18  Practice of this Court.

19        Pending before the Court are Plaintiff's Motion for Summary Judgment and

20  Defendant's Cross-Motion for Summary Judgment.  For the following reasons, the Magistrate

21  Judge Recommends that the District Judge, after her independent review, GRANT Plaintiff's

22  Motion for Summary Judgment *[Dkt 7]* and DENY Defendant's Cross-Motion for Summary

23  Judgment *[Dkt 10]*.

24

25  **PROCEDURAL HISTORY**

26        On September 5, 2002, Plaintiff submitted to the Social Security Administration a

27  Disability Report. (TR. 151-154). Plaintiff alleged a disability onset date of August 18, 2002.

28  (TR.151).  She alleged that she was disabled due to a knee injury and osteoarthritis, which

1  limits her ability to stand for long periods of time and forces her to walk with a cane or
2  crutches. (TR. 156).  Plaintiff also reported difficulty in sitting for long periods of time due
3  to pain in her lower back. (*Id.*).

4        The Social Security Administration (SSA) denied her application initially and on
5  reconsideration. (TR. 113-123). Plaintiff requested review and on October 15, 2003,
6  appeared with counsel at a hearing before Administrative Law Judge (ALJ) Lauren R.
7  Mathon. (TR. 47).  The ALJ found that Plaintiff was not disabled. (TR. 31-32).  Plaintiff
8  appealed the ALJ's decision, but the Appeals Council denied review, making the decision of
9  the ALJ the final decision of the Commissioner. (TR. 6-9); 20 C.F.R. § 404.981.  Plaintiff
10 then filed the instant complaint in U.S. District Court appealing the Commissioner's final
11 decision.   Plaintiff filed a motion for summary judgment on March 31, 2005.   The
12 Commissioner filed a cross-motion for summary judgment on June 1, 2005.  Plaintiff filed
13 her reply on July 18, 2005.

14

15 **PLAINTIFF'S WORK HISTORY**

16        Plaintiff was born June 23, 1948. (TR. 51).  Plaintiff testified at the hearing before the
17 ALJ that she completed the ninth grade and never received a GED. (TR. 54).  She also
18 testified that she was in special education classes from the time she was in fifth grade. (TR.
19 54).

20        Plaintiff worked as a caregiver from 1986 until 1996. (*Id.*).  During that time she
21 worked as a caregiver in an adult care home which required her to bathe, dress and feed the
22 residents as well as give them their medicines and clean the house. (*Id.*).  This job required
23 Plaintiff to perform a lot of lifting. (TR. 66-67).  Plaintiff also worked as a babysitter from
24 1985 until 1988. (TR. 67). From November 1996 through July 1999 Plaintiff worked as a
25 cashier at Texaco. (TR. 66).  This job required Plaintiff to stand for her entire work day. (*Id.*)
26 It also required that Plaintiff clean and stock the store. (*Id.*).

27        Plaintiff worked at a call center from June 1999 until February 2001. (TR. 60).  At this
28 job she initially worked as a CSR-I and was later promoted to CSR-II. (TR. 61).  As a CSR-I,

1   Plaintiff took orders over the phone. (*Id.*).  As a CSR-II, Plaintiff was moved into a customer

2   service position. (*Id.*)  Both positions required her to do filing, shred paper, and work on the

3   computer. (*Id.*).  The desk that she worked at could be placed in positions for either sitting

4   or standing. (TR. 62).  Plaintiff testified that in her position as CSR-II, she was standing and

5   walking approximately five hours out of an eight hour day. (TR. 62-63).  In her position as

6   CSR-I she sat at the computer all day. (TR. 84).

7          Plaintiff worked as a cashier at a gas station from April 2001 until July 2001. (TR.

8   60).  This job required Plaintiff to mostly stand as well as to perform tasks of stocking and

9   cleaning. (*Id.*)

10          From July 2001 until September 2001, Plaintiff worked as a telemarketer at Rockwell

11   Holdings in New York. (TR. 59).  This job required Plaintiff to listen while a customer

12   service representative spoke with a customer about credit cards. (TR. 81).  Plaintiff was also

13   required to put information into a computer. (TR. 82).  From January 2002 until April 2002,

14   Plaintiff worked as a cashier at a gas station in Chicago. (TR. 58).  This job required Plaintiff

15   to stand for most of her work day and included tasks of stocking, cashiering and cleaning of

16   floors. (*Id.*)  Plaintiff worked from May 22, 2002 until August 18, 2002 as a cashier at

17   Walgreens. (TR. 56-57).

18

19   **PLAINTIFF'S MEDICAL HISTORY**

20          Plaintiff's medical problems with her knee began in 1981 when she underwent surgery

21   after she "shattered the kneecap." (TR. 71).  Her condition worsened after she fell at the

22   airport in 2002. (TR. 71, TR. 238-239).  On August 18, 2002, Plaintiff was seen at St.

23   Joseph's Hospital emergency room. (TR. 238-239).  "[S]he has chronic knee pain, but it has

24   worsened over this time.  She fell last week on her knee and the pain has been worse ever

25   since then." (TR. 238).

26          After her visit to the emergency room, Plaintiff was seen by Dr. Robert Kersey of

27   Southern Arizona Orthopedics, on August 22, 2002, at which time he assessed Plaintiff with

28   patellar chronic dislocation and osteoarthritis in her right knee. (TR. 207).  He noted that

1  radiographs demonstrated advanced degenerative changes in all three compartments of the

2  knee as well as showed that cerclage wire around the patella is broken in at least two places.

3  (*Id.*).   The broken wire is bent toward the knee and the patella is completely dislocated

4  laterally. (*Id.*).  Dr. Kersey noted that he discussed surgery with Plaintiff and "she adamantly

5  declines surgical intervention." (*Id.*).   The doctor wrote Plaintiff off work for two weeks,

6  indicating that she should return back to work after that time and was to follow up with the

7  doctor if her pain persisted. (TR. 208).  There is a note in Plaintiff's file dated September 6,

8  2002, indicating that Plaintiff called Dr. Kersey's office requesting a letter that stated that she

9  was totally disabled. (*Id.*).  The notation reflects that Plaintiff was informed that Dr. Kersey

10  did not perform disability exams and referred her to Social Security. (*Id.*).

11  Plaintiff was again seen by Dr. Kersey on September 30, 2002.  The doctor noted

12  "patient's pain is essentially unchanged." (TR. 206).  Again Dr. Kersey assessed Plaintiff with

13  right knee chronic patellar dislocation and osteoarthritis. (*Id.*).  "I strongly recommended

14  injection, however she declined.  This may not improve her mechanical symptoms, however

15  her pain may improved [sic]. She does not desire any other surgical intervention." (TR.206).

16  Plaintiff was seen by Dr. Mark Wolfson, on October 10, 2002. (TR. 215-217).  Dr.

17  Wolfson assessed Plaintiff with severe osteoarthritis in her right knee. (TR. 217).  He

18  indicated on a prescription pad sheet that this would preclude her from prolonged standing

19  or walking, in essence excusing her from work at Walgreens. (*Id.*).

20  In an October 22, 2003 letter to Plaintiff's attorney, Dr. Kersey indicated that plaintiff

21  suffered from advanced knee osteoarthritis and chronic knee patella dislocation. (TR. 289).

22  "People in this situation often have a great deal of difficulty with stairs, steps, inclines,

23  walking for prolonged distance, or even sometimes standing for a prolonged period of time."

24  (*Id.*).  He noted that the general symptoms from which Plaintiff suffered can become severe

25  enough to inhibit activities of daily living. (*Id.*).  However, the doctor also noted "I have not

26  seen Ms. Kolep since September 30, 2002, and it is difficult for me to comment on her

27  specific level of symptoms and activity at this particular time." (*Id.*).

28  Plaintiff also suffers from glaucoma which has caused her to lose vision in her left

1   eye. (TR. 89-91, 227-8, 293).  She administers three different drops to her eyes twice a day.

2   (TR. 70).  Plaintiff had laser surgery on her right eye for glaucoma three years before the ALJ

3   hearing. (TR. 76).

4       Plaintiff suffers from anxiety attacks for which she takes lorazepam. (Tr. 69, 229, 230-

5   231).  Plaintiff testified that she is "supposed to stay calm and stay away from stressful –

6   stress, problems and if I'm around anybody that upsets me, I go into an anxiety attack." (TR.

7   72). Plaintiff also suffers from high blood pressure and incontinence. (TR. 70).  Plaintiff also

8   testified that she suffers from back pain. (TR. 88, 293).

9       Plaintiff's treating physician, Dr. Goedecke, performed an evaluation entitled "Medical

10  Source Statement Concerning The Nature And Severity An Individual's Physical

11  Impairment." (TR. 290-293).  Dr. Goedecke determined that Plaintiff had not been capable

12  of performing sustained light work on a regular and continuing basis, nor had she been

13  capable of performing sustained sedentary work on a continual or regular basis. (TR. 290-

14  91).  Dr. Goedecke also indicated that "NO [sic], even if my patient had the freedom to

15  alternate sitting and standing during the workday, I believe my patient still would be limited

16  as I have indicated above." (TR. 291).  The doctor found that Plaintiff would have a moderate

17  limitation of the ability to maintain attention and concentration for extended periods of time.

18  (TR. 292). He indicated that Plaintiff had a moderately severe limitation in her ability to

19  perform activities within a schedule, maintain regular attendance and be punctual as well as

20  her ability to complete a normal workday and work week without interruptions from her

21  medical symptoms and to perform at a consistent pace. (*Id.*).

22      Dr. Goedecke noted in his report that Plaintiff has osteoarthritis in her right knee. (TR.

23  293).  He also indicated that Plaintiff suffered from diskogenic disease of the lumbar spine,

24  indicating that an x-ray of her back showed lumbarization and narrowing of L4/5 interspace.

25  (*Id.*).  Dr. Goedecke assessed that because of her knee and back pain Plaintiff could only

26  stand for 15 minutes at a time. (*Id.*).  The doctor documented that Plaintiff suffered from

27  glaucoma and was blind in her left eye. (*Id.*).  He noted that these problems affected

28  Plaintiff's equilibrium. (*Id.*).

1    Plaintiff was also assessed by James Rau, Ph.D., who evaluated Plaintiff's
2    neuropsychological status. (TR. 294-99).   Dr. Rau administered the Wechsler Adult
3    Intelligence Scale - III, the Wechsler Memory Scale - III, and the Trail Making Test. (TR.
4    294).  Dr. Rau summarized the test results in his report. (TR. 297).  The tests indicated that
5    Plaintiff is functioning intellectually in the borderline range of intelligence. (TR. 297).
6    Plaintiff's "prorated Verbal IQ is 78, prorated Performance IQ is 79 and Full Scale IQ is
7    77...specific analysis of the data again highlights low average to borderline deficient
8    functioning within each domain of functioning." (*Id.*)  With respect to Plaintiff's memory
9    functioning, Dr. Rau found "remarkable variability from the low end average to the high
10   average range.  There is no indication of deficiency and certainly not of impairment." (*Id.*)
11   The doctor also found that Plaintiff did not have problems with learning. (*Id.*).  "Her capacity
12   to register information based on one time presentation was low average but she was in the
13   average range for learning based on serial repetition.  Her ability to retrieve what she had
14   learned was average." (*Id.*).  Dr. Rau also determined that Plaintiff's visuospatial functioning
15   and her executive level attention were both intact. (*Id.*).

16   In his overall assessment of Plaintiff, Dr. Rau indicated that while plaintiff indicates
17   that she is stressed she "does not give any detail indicating bona-fide clinical level anxiety."
18   (TR. 298).  He indicated that he did not see evidence of anxiety, panic attacks, or any type
19   of anxiety disorder. (*Id.*)  The doctor made the following diagnosis:

20          Axis I:     Adjustment disorder NOS.
             Axis II:    Borderline intellectual functioning.
21          Axis III:   Deferred to physician for specific diagnosis.

22   (TR. 298).

23   Two Residual Functional Capacity (RFC) Assessments were performed. (TR. 218-25,
24   252-59).   The first RFC assessment was performed on January 9, 2003, by Dr. Frank
25   Shallenberger Jr. (TR. 225).  Dr. Shallenberger found that Plaintiff could lift and/or carry 20
26   pounds occasionally and 10 pounds frequently. (TR. 219).  The doctor found that Plaintiff
27   could sit for six hours a day and could stand for at least two hours a day. (*Id.*).  However, he
28   noted that Plaintiff "must take usual breaks.  The claimant may stand/walk slightly more than

two hours.  The two hours spent standing/walking should be not consecutive but should be broken into shorter periods of time never to exceed fifteen (15) minutes at any one time during the eight hour work day." (*Id.*).  Dr. Shallenberger also found that pushing and/or pulling should be limited in the lower extremities. (*Id.*).  "The claimant should avoid the use of the RLE for pushing/pulling and any repetitive movements." (*Id.*).

Dr. Shallenberger also found that Plaintiff could climb ramps and stairs but could never climb ropes, ladders and scaffolding. (TR. 220).  He found that Plaintiff could occasionally balance, stoop, kneel, crouch, and crawl. (*Id.*).  He found that no manipulative limitations and no visual limitations had been established. (TR. 221).  Communicative and environmental limitations also had not been established. (TR. 223).  Dr. Shallenberger determined that "claimant appears to exaggerate her symptoms and is therefore only partially credible." (TR. 223).  Dr. Shallenberger concluded that his findings were not significantly different from those of the treating physicians. (TR. 224).  "Her orthopedist had indicated she could RTW in August 2002 and she objected to that. Hoever [sic] she refused all specific surgical or medical interventions which are invasive." (*Id.*).  It was Dr. Shallenberger's opinion that Plaintiff could perform substantial gainful activity. (TR. 225).

The second RFC assessment was performed on March 17, 2003 by a different Disability Determination Service doctor. (TR. 252-59).  This doctor also determined that Plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently. (TR. 253). He also found that Plaintiff could stand and/or walk for "slightly more" than two hours but those two hours should be broken into 15 minute segments. (*Id.*).  The doctor found that use of a cane had not been medically proven. (*Id.*).  He did determine that Plaintiff should avoid pushing and pulling with the right leg. (*Id.*).  The doctor indicated that, due to knee pain, Plaintiff could occasionally balance, stoop, kneel, crouch, and crawl. (TR. 254).  In the section for limitations on climbing he indicated both occasionally and never. (*Id.*).  He found no manipulative limitations. (TR. 255).

The doctor determined that Plaintiff's left eye was limited as to near acuity, far acuity, depth perception, accommodation, color vision, field of vision. (*Id.*).  He found no limitations

in the right eye. (*Id.*).   The doctor indicated that no communicative limitations were established. (TR. 256).  In the environmental limitations section, the doctor concluded that Plaintiff should avoid even moderate exposure to hazards with the notation that she should avoid heights due to knee pain. (*Id.*).   While the doctor found that the symptoms were attributable to a medically determinable impairment, he also found that Plaintiff was only partially credible. (TR. 257).  He noted that while she was allowed to return to work she wanted a letter indicating that she was totally disabled. (*Id.*).

## TESTIMONY OF VOCATIONAL EXPERT

At the ALJ hearing, Ruth VanVleet, a vocational expert, testified. (TR. 95-109, 139-140).  VanVleet testified that Plaintiff's job as cashier at Walgreens and at the gas stations would be classified as light, unskilled jobs.[1] (TR. 96).   The gas station position which required her to lift up to 50 pounds would be classified as a medium, unskilled position. (TR. 101).   VanVleet classified Plaintiff's position at Rockwell Holdings as a sedentary, semiskilled job. (TR. 96).  She based the semiskilled classification on the fact that use of a computer was required. (*Id.*).  However, VanVleet determined that as the position was being performed by Plaintiff, with someone else at the company putting the correct screen on the computer for her, the job would be unskilled. (TR. 99).   Finally, VanVleet testified that Plaintiff's positions as CSR-I and CSR-II are tele-services positions and are considered sedentary, semiskilled positions. (TR. 99-101).   VanVleet noted that the added tasks in the CSR-II position which required Plaintiff to stand for 5 hours a day made the position a light job. (TR 100-01).  However, she testified that the CSR-II position is "a sedentary, semiskilled job in the general nature." (TR. 101).  VanVleet testified that Plaintiff's position as care giver has a general classification as a medium, semi-skilled job. (*Id.*).  However, where Plaintiff was required to lift patients, weighing up to 230 pounds, the classification would then be

---

[1]VanVleet testified that the Dictionary of Occupational Titles would classify the cashier position at Walgreens as sedentary, unskilled but based on the fact that Plaintiff had to be on her feet all day, VanVleet would classify it as light, unskilled. (TR. 96).

1    very heavy, semiskilled. (*Id.*).  VanVleet found that Plaintiff's childcare position would have

2    been of the light, unskilled capacity. (*Id.*).

3           The ALJ next posed hypotheticals to VanVleet.   VanVleet determined that a

4    hypothetical person with Plaintiff's education, age and vocational background, who could

5    perform sedentary work but had a limitation where she could only occasionally push/pull

6    with the right leg; could only stand or walk for 15 minute segments; and had no vision in her

7    left eye, would be able to perform a telemarketing position. (TR. 101-02).  VanVleet testified

8    that in her experience people with monocular vision have been able to perform the CSR-I job

9    as it was described by Plaintiff. (TR. 102).

10          VanVleet also explained that if a person had a limited ability to use a computer and

11   had to have someone else change the screens, as Plaintiff described with her job at Rockwell

12   Holdings, that person "would not be able to perform in that capacity." (TR. 103).  According

13   to VanVleet, limited use of the computer "such as where...someone would need to change

14   the screen for them on the job, that would not be competitive." (TR. 104).  VanVleet testified

15   that other sedentary, unskilled jobs existed, which could be performed by someone with the

16   limitations described by the ALJ. (TR. 104-05).  Those jobs were assembly or packaging jobs

17   of which there are approximately 439,000 nationally and approximately 17,416 in Arizona

18   and hand packager of which there are approximately 493,000 nationally and approximately

19   9,900 in Arizona. (TR. 105).

20          VanVleet testified a limitation on standing and walking generally does not interfere

21   with a sedentary job but conceded that when standing and walking must be broken up into

22   15 minute increments it could interfere with the quantity of output in a job. (TR. 106).

23   VanVleet further testified that the need for a cane would not be a hindrance in the types of

24   jobs that were being discussed because they were sedentary in nature. (TR. 108). VanVleet

25   also determined that Plaintiff's age would not have much of an effect on adjustment to the

26   jobs that she had described. (TR. 107).

27

28

**CLAIM EVALUATION**

Disability claims are evaluated pursuant to a five-step sequential process.  20 C.F.R. §§404.1520, 416.920; *Baxter v. Sullivan,* 923 F.2d 1391, 1395 (9th Cir. 1991).  The first step requires a determination of whether the claimant is engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If so, then the claimant is not disabled under the Act and benefits are denied.  *Id.*  If the claimant is not engaged in substantial gainful activity, the ALJ then proceeds to step two which requires a determination of whether the claimant has a medically severe impairment or combination of impairments.  20 C.F.R. §§ 404.1520(c), 416.920(c).

In making a determination at step two, the ALJ uses medical evidence to consider whether the claimant's impairment more than minimally limited or restricted his or her physical or mental ability to do basic work activities.  *Id.*  If the ALJ concludes that the impairment is not severe, the claim is denied.  *Id.*  Upon a finding of severity, the ALJ proceeds to step three which requires a determination of whether the impairment meets or equals one of several listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. Pt. 404, Subpt. P, App.1.  If the claimant's impairment meets or equals one of the listed impairments, then the claimant is presumed to be disabled and no further inquiry is necessary.  If a decision cannot be made based on the claimant's then current work activity or on medical facts alone because the claimant's impairment does not meet or equal a listed impairment, then evaluation proceeds to the fourth step.

The fourth step requires the ALJ to consider whether the claimant has sufficient residual functional capacity ("RFC")[2] to perform past work.   20 C.F.R. §§ 404.1520(e), 416.920(e).  If the ALJ concludes that the claimant has RFC to perform past work, then the claim is denied.  *Id.*  However, if the claimant cannot perform any past work due to a severe impairment, then the ALJ must move to the fifth step, which requires consideration of the

---

[2]Residual functional capacity is defined as that which an individual can still do despite her limitations. 20 C.F.R. § 404.1545.

1   claimant's RFC to perform other substantial gainful work in the national economy in view

2   of claimant's age, education, and work experience.  20 C.F.R. §§ 404.1520(f). 416.920(f).

3       At step five, in determining whether the claimant retained the ability to perform other

4   work, the ALJ may refer to Medical Vocational Guidelines ("grids") promulgated by the

5   SSA. *Desrosiers,* 846 F.2d at 576-577.  The grids are a valid basis for denying claims where

6   they accurately describe the claimant's abilities and limitations.  *Heckler v. Campbell,* 461

7   U.S. 458, 462, n.5 (1983).  However, because the grids are based on exertional or strength

8   factors, where the claimant has significant nonexertional limitations, the grids do not apply.

9   *Penny,* 2 F.3d at 958-959; *Reddick v. Chater,* 157 F.3d 715, 729 (9th Cir. 1998). Where the

10  grids do not apply,  the ALJ must use a vocational expert in making a determination at step

11  five.   *Desrosiers,* 846 F.2d at 580.   If application of the grids establishes disability,

12  consideration of non-exertional limitations is not necessary.

13  ### THE ALJ'S FINDINGS

14      In the instant case, the ALJ made the following findings:

15  1.    The claimant meets the nondisability requirements for a period of disability
16      and disability insurance benefits set forth in Section 216(i) of the Social
        Security Act and is insured for benefits through the date of this decision.

17  2.    The claimant has not engaged in substantial gainful activity since the alleged
18      onset of disability.

19  3.    The claimant has right knee osteoarthritis, dislocated knee patella, status post
        eye surgery, glaucoma, borderline intellectual functioning and degenerative
20      disc disease of the lumbar spine, which are considered impairments that are
        "severe" based on the requirements in the Regulations (20 CFR §§ 404.1520(c)
21      and 416.920(b)).  The claimant has the following non-severe impairments:
        panic disorder, anxiety disorder, adjustment disorder (per Exhibit 14F),
22      gastroesophageal reflux disorder and urinary incontinence.

23  4.    These medically determinable impairments do not meet or medically equal one
        of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.
24
    5.    The undersigned finds the claimants allegations regarding her limitations are
25      not totally credible for the reasons set forth in the body of the decision.

26  6.    The claimant has the residual functional capacity of sedentary level
        functioning.  Claimant can sit for about 6 hours and stand/walk at only 15
27      minute segments, each at a time, in an 8 hour work day.  She has a limited
        ability to perform occasional push/pull functions and repetitive movements
28      with the right leg.  Claimant is precluded from climbing ladders, ropes and

scaffolds.   She had visual limitations for near acuity, far acuity, depth perception, accommodation, color vision and field vision.   She should avoid even moderate exposure to unprotected heights due to knee pain.   Claimant has moderately [sic] limitation in her ability to concentrate (SSR 96-8p).

7.    The claimant's past relevant work as a call center telemarketer did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR §§ 404.1565 and 416.965).

8.    The claimant's medically determinable impairments do not prevent the claimant from performing her past relevant work as a call center telemarketer, as previously performed.

9.    Based on an exertional capacity for sedentary work and the claimant's age, education, and work experience, and vocational expert evidence, the claimant is not disabled.

10.   The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR §§ 404.1520(e) and 416.920(e)).

(TR. 31-32).

**ARGUMENT**

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff in her Motion for Summary Judgment, argues that the ALJ's decision was not based on substantial evidence and was not free of legal error. (Plaintiff's Motion, Docket 7). Plaintiff argues that the ALJ erred when she rejected the opinion of Plaintiff's treating physician without providing a legitimate reason. (*Id.* at 7).  Plaintiff also argues that the ALJ erred in assessing Plaintiff's credibility and in assessing the lay statements in the record. (*Id.* at 9).  Finally, the Plaintiff argues that the ALJ based her decision on defective vocational analysis. (*Id.* at 11).  This argument has two parts.  The first is that the ALJ improperly considered accommodated work as past relevant work. (*Id.*).  The second part is that the ALJ failed to fully develop the record regarding Plaintiff's past relevant work as required by Rulings 82-61. (*Id.* at 12).  Plaintiff therefore requests that this Court reverse the decision of the ALJ and issue an order awarding benefits to the Plaintiff or at least remand the case for further proceedings. (*Id.* at 13).

1    D<small>EFENDANT'S</small> C<small>ROSS</small>-M<small>OTION FOR</small> S<small>UMMARY</small> J<small>UDGMENT</small>

2         Defendant argues that the ALJ's decision was supported by substantial evidence and

3    free of legal error. (Defendant's Motion, Docket 10).  Defendant argues that the ALJ properly

4    rejected the treating physicians opinion, finding that it was conclusory and unsupported by

5    the record. (*Id.* at 2).  Defendant also argues that the ALJ did not arbitrarily reject Plaintiff's

6    subjective testimony but rather made a credibility finding supported by the record. (*Id.* at 5).

7    Defendant further argues that the ALJ did not err by not addressing the statements of the lay

8    witnesses because the C.F.R. has changed and now provides that an agency "may" consider

9    the statements of lay witnesses. (*Id.* at 6).  The Defendant further argues that even were the

10   ALJ required to address the statements of lay witnesses, failure to do so was harmless error.

11   (*Id.* at 7).  Finally, the Defendant argues that the ALJ is required to determine whether or not

12   a claimant's RFC is such that it permits the claimant to return to past relevant work as

13   actually performed or as it is generally performed in the economy. (*Id.* at 8).  Thus the

14   Defendant contends that there are no grounds for remand and as such Plaintiff's motion for

15   summary judgment should be denied and Defendant's cross-motion for summary judgment

16   should be granted.

17

18   **S<small>TANDARD OF</small> R<small>EVIEW</small>**

19        Pursuant to 42 U.S.C. § 423(d)(1)(A), an insured individual is entitled to disability

20   insurance benefits if he or she demonstrates, through medically acceptable clinical or

21   laboratory standards, an inability to engage in substantial gainful activity due to a physical

22   or mental impairment that can be expected to last for a continuous period of at least twelve

23   months.  The Ninth Circuit has stated that "'a claimant will be found disabled only if the

24   impairment is so severe that, considering age, education, and work experience, that person

25   cannot engage in any other kind of substantial gainful work which exists in the national

26   economy.'"  *Penny v. Sullivan,* 2 F.3d 953, 956 (9<small>th</small> Cir. 1993) quoting *Marcia v. Sullivan,*

27   900 F.2d 172, 174 (9<small>th</small> Cir. 1990).

28        To establish a *prima facie* case of disability, the claimant must demonstrate an

1    inability to perform his or her former work. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir.

2    1984).  Once the claimant meets that burden, the Commissioner must come forward with

3    substantial evidence establishing that the claimant is not disabled.  *Fife v. Heckler*, 767 F.2d

4    1427, 1429 (9th Cir. 1985).

5        Pursuant to 42 U.S.C. §405(g), the findings of the Commissioner are conclusive and

6    courts may overturn the decision to deny benefits "only if it is not supported by substantial

7    evidence or it is based on legal error."  *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir.

8    1992)(citations omitted).  Therefore, the Commissioner's determination that a claimant is not

9    disabled must be upheld if the Commissioner applied the proper legal standards and if the

10   record as a whole contains substantial evidence to support the decision.  *Clem v. Sullivan*,

11   894 F.2d 328, 330 (9th Cir. 1990) (citing *Desrosiers v. Secretary*, 846 F.2d 573, 575-76 (9th

12   Cir. 1988); *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983)).  Substantial evidence is

13   defined as such relevant evidence which a reasonable mind might accept as adequate to

14   support a conclusion. *Jamerson v. Chater,* 112 F.3d 1064, 1067-68 (9th Cir. 1997); *Winans*

15   *v. Bowen,* 853 F.2d 643, 644 (9th Cir. 1988).  However, substantial evidence is less than a

16   preponderance.  *Matney,* 981 F.2d at 1019.  A denial of Social Security benefits will be set

17   aside if the Commissioner fails to apply proper legal standards in weighing the evidence,

18   even though the findings may be supported by substantial evidence.  *Winans,* 853 F.2d at

19   644.

20       The Commissioner, not the court, is charged with the duty to weigh the evidence,

21   resolve material conflicts in the evidence and determine the case accordingly. *Id.*  However,

22   when applying the substantial evidence standard, the court should not mechanically accept

23   the Commissioner's findings, but should review the record critically and thoroughly.  *Day*

24   *v. Weinberger*, 522 F.2d 1154 (9th Cir. 1975).  Reviewing courts must consider the evidence

25   that supports as well as detracts from the examiner's conclusion.  *Id*. at 1156.  Moreover, "if

26   the evidence can support either outcome, the court may not substitute its judgment for that

27   of the ALJ."  *Matney,* 981 F.2d at 1019

28       In evaluating evidence to determine whether a claimant is disabled, the opinions of

1    treating physicians are entitled to great weight. *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th

2    Cir. 1989). However, even a treating physician's opinion is not necessarily conclusive on

3    either the issue of a physical condition or the ultimate issue of disability. *Id.* When resolving

4    a conflict between the opinion  of a treating physician and that of an examining physician,

5    the opinion of the treating physician is entitled to greater weight and may be rejected only

6    on the basis of findings setting forth specific legitimate reasons based on substantial evidence

7    of record. *Magallanes,* 881 F.2d at 751.  Moreover, the Commissioner may reject the

8    treating physician's uncontradicted opinion as long as the Commissioner sets forth clear and

9    convincing reasons for doing so. *Magallanes*, 881 F.2d at 751.

10       Further, when medical reports are inconclusive, questions of credibility and resolution

11   of conflicts in the testimony are functions solely of the Commissioner. *Magallanes,* 881 F.2d

12   at 751 (citations omitted).  However, the Commissioner's finding that a claimant is less than

13   credible must have some support in the record. *See Light v. Social Security Administration,*

14   119 F.3d 789 (9th Cir. 1997); *see also Connett v. Barnhart,* 340 F.3d 871 (9th Cir. 2003).

15

16   **DISCUSSION**

17       OPINION OF PLAINTIFF'S TREATING PHYSICIAN

18       In determining that Plaintiff was not disabled, the ALJ considered the testimony of

19   Dr. Goedecke, one of Plaintiff's treating physicians. While the testimony of a treating

20   physician is entitled to great weight, an ALJ may reject it if she establishes clear and

21   convincing reasons for so doing. *Magallanes*, 881 F.2d 747, 751(9th Cir. 1989).  The ALJ

22   reasoned that Dr. Goedecke's opinion was conclusory and unsupported by the medical

23   evidence. (TR. 30).   "Moreover, the doctor's opinion contrasts sharply with the other

24   evidence of record, which renders it less persuasive." (*Id.*).  If the treating physician's opinion

25   is contradicted by another doctor, the ALJ may reject that opinion only if she provides

26   specific and legitimate reasons supported by substantial evidence in the record. *Lester v.*

27   *Charter*, 81 F.3d 821, 830 (9th Cir.1995).  The ALJ has not done this.

28       In this case, the ALJ rejected Dr. Goedecke's opinion as conclusory, unsupported by

1   medical evidence, and contrasting "sharply with other evidence of record." (TR. 30). What

2   specific evidence sharply contrasts with Dr. Goedecke's opinion is not identified.

3       The ALJ accorded particular weight to the opinion of the State Agency physician,

4   finding that this assessment was supported by the evidence in the record. (TR. 29). Again,

5   the ALJ did not identify any specific medical evidence that corroborated the residual

6   functional capacity assessment determined by the State Agency physician.

7       The ALJ determined Claimant had severe impairments, including "right knee

8   osteoarthritis, dislocated knee patella, status post-eye surgery, glaucoma, borderline

9   intellectual functioning and degenerative disc disease of the lumbar spine." (TR. 31). The

10  ALJ also identified as non-severe impairments: "pain disorder, anxiety disorder, adjustment

11  disorder, gastroesophageal reflux disorder, and urinary incontinence." (*Id.*)  The ALJ also

12  identified several physical limitations, including stand or walk for only fifteen minute

13  segments, limited push/pull functions or repetitive movements with right leg, and no

14  climbing.  (*Id.*)    Visual limitations included "near acuity, far acuity, depth perception,

15  accommodation, color vision and field of vision." (*Id.*)  Finally, the ALJ noted Claimant's

16  moderate limitation in ability to concentrate. (*Id.*)  At the time of the hearing, Claimant was

17  55 years old and had a body mass index of 36.3, and a history of hypertension.  Because of

18  her vision problems, Claimant did not drive.

19      Dr. Goedecke concluded that Claimant could not perform sedentary work on a regular

20  and continuing basis.  (TR. 290).  Concerning non-exertional limitations, Dr. Goedecke

21  determined Claimant had a moderate impairment in her ability to maintain concentration or

22  attention for an extended period of time.  (TR. 292). Dr. Goedecke determined moderately

23  severe limitations on Claimant's ability to maintain regular attendance and be punctual and

24  her ability "to complete a normal work day and work week without interruptions from

25  medically based symptoms and to perform at a consistent pace without an unreasonable

26  number and length of rest periods." (*Id.*)

27

28

1    The comments section of Dr. Goedecke's report reads as follows[3]:

2            Patient has osteoarthritis of right knee diskogenic disease of the
         lumbar spine and glaucoma and blindness in left eye.  Pain
3            lower back.   Pain right knee.   X-ray of back reveals
         lumbarization of S; narrowing of L4/5 interspace suggesting
4            diskogenic disease. Treatment with Naprosen for knee and back
         - knee brace.  Encouraged to lose weight and exercise since
5            arthritis chronic may worsen. Prognosis poor. Can only stand
         fifteen minutes at a time because of knee and back pain.
6            Equilibrium also affected because of blindness in left eye.

7    (TR. 293)

8        Because the ALJ did not identify specific portions of the medical record that

9    contradict Dr. Goedecke, it cannot be determined which portion of the report is considered

10   contrary to the record.  However, everything in the comment section is verified by the ALJ's

11   own findings.

12       There were two State Agency physician assessments in this case.  (TR., Exhibits 5F

13   and 9F.)  The assessment prepared by Dr. Shallenberger on January 9, 2003, was the one

14   particularly relied upon by the ALJ.  Dr. Shallenberger determined the Claimant could lift

15   twenty pounds occasionally and ten pounds frequently; that she should avoid using right leg

16   for pushing, pulling or repetitive movements; that periods of standing or walking should

17   never exceed fifteen minutes; the Claimant can occasionally balance, stoop, kneel, crouch

18   or crawl, but never for climbing ropes, ladders and or scaffolds; and no visual limitations.

19   (TR. 219-221.)

20       Another Physical Residual Functional Capacity Exam was prepared on March 17,

21   2003. (Ex 9-F); (TR. 252-59).   It reached the same conclusions regarding exertional

22   limitations and postural limitation by Dr. Shallenberger, but the comment "use of cane not

23   medically proven" was added.  In this evaluation, the glaucoma and visual limitations for the

24   left eye are noted. (TR. 255).  However, in finding Claimant not to be credible, the assessing

25   physician stated.

26            Claimant is only partially credible.  Alleges blindness but on
         exam VA OD - 20/25 was allowed back to work but wanted
27

28       _____

         [3]The Court has attempted to interpret the abbreviations used by Dr. Goedecke.

- 17 -

1    letter re: total disability which was refused.

2    (TR. 257).  The additional comments section reviews Claimant's conditions and is consistent

3    with Dr. Goedecke's comments.   Because this is a physical assessment, there is no

4    consideration of Claimant's borderline intellectual functioning in the report.

5        In rejecting Dr. Goedecke's opinion, the ALJ reasoned:

6            The undersigned has considered the opinion by Drs. (sic)
             Goedecke (Exhibit 13F) and has rejected it as conclusory and
7            unsupported by the medical evidence of record.  Moreover, the
             doctor's opinions contrast sharply with the other evidence of
8            record, which renders it less persuasive.

9    (TR. 30).

10       There is no dispute concerning Claimant's many diagnosed conditions.  The difference

11   of opinion, if any, is whether Claimant can return to sedentary work on a regular and

12   sustained basis.

13       Both the ALJ, and the physician's performing the RFC's relied upon by the ALJ, place

14   great emphasis on Claimant's failure to return to work at Walgreen's in September 2002.  Dr.

15   Shallenberger referred to Claimant's failure to return to work after two weeks and her refusal

16   to undergo surgery to correct her knee condition.  (TR. 224).  The other RFC also referred

17   to Claimant's request for a disability letter which was declined.   (TR. 257).   Put in

18   perspective, it is clear that the ALJ and the two RFC physicians have misinterpreted Dr.

19   Kersey's reports.

20       On August 18, 2002, Claimant presented herself at the St. Joseph's Hospital

21   Emergency Department complaining of right knee pain.  Since the beginning of the year,

22   Claimant had been working as a cashier, first at a gas station and for the previous three

23   months at Walgreen's.  Both jobs required Claimant to be on her feet for most of the day.

24       Claimant was examined by James D. Behra, M.D.  Claimant reported to Dr. Behra that

25   her chronic knee pain had worsened over the past two weeks.  She also reported falling on

26   her right knee the previous week which worsened the pain.  (TR. 238).  Claimant reported

27   her history of patellar fracture, dislocation and surgery, as well as chronic knee pain with

28   weight-bearing and walking.   Claimant's complaints were supported by Dr. Behra's

examination and the x-ray of the right knee. (TR. 238-39). Claimant was given an Ace wrap and crutches, instructed to ice and elevate the knee and use Nasprosyn as needed. She was referred to orthopedics. Claimant was told to return if her condition worsened. (TR. 239).

Claimant was seen at Southern Arizona Orthopedics by Robert C. Kersey, M.D., on August 22, 2002. (TR. 207-08). Claimant complained of right knee pain that had increased since she fell, tripping over toys, on August 17, 2002.[4]  Again, Dr. Kersey's physical exam supported Claimant's complaints. A review of the x-rays of Claimant's right knee confirmed the seriousness of her condition:

> Radiographs of her left (sic) knee demonstrate advanced degenerative changes in all three compartments. She does have a cerclage wire around her patella that is broken in at least two places and the twisted portion of the wire appears to be bent in toward the knee. The patella is completely dislocated laterally on the merchant view.

(TR. 207).

Dr. Kersey concluded that Claimant "had an exacerbation of her underlying degenerative changes." (*Id.*)  Claimant declined injections or surgery.  Dr. Kersey told Claimant to continue with anti-inflammatories and rest. He concluded his report:

> She was written off work for two weeks and after which will return back to work and follow up with me if her pain persists.

(TR. 208). Dr. Wolfson was copied on this report.

On September 5, 2002, Claimant applied for disability insurance benefits and supplemental security income benefits.

On September 6, 2002, Claimant telephoned Dr. Kersey's office, asking for a letter saying she was completely disabled. She did not speak with Dr. Kersey. Claimant was told that Dr. Kersey did not do disability evaluations. Claimant reported she had new symptoms and asked to be seen again by Dr. Kersey. (*Id.*)

Claimant did see Dr. Kersey again on September 30, 2002. (TR. 206). Dr. Kersey reports, "The patient's pain is essentially unchanged. She continues to get significant symptoms and has difficulties with activities." (*Id.*)  In other words, Claimant's symptoms

---

[4]August 17, 2002, was a Saturday.

1   did not subside, as Dr. Kersey must have anticipated when he suggested she could return to

2   work in two weeks.

3          Nothing in this note suggests that Claimant is malingering.  Nor did Dr. Kersey refuse

4   to do a disability exam.  Instead, he found "a significant problem with the right knee" and

5   suggests Claimant "seek out a physician to evaluate her level of disability which would

6   include a report of her job requirements."  (*Id.*)  This is consistent with the September 6,

7   2002, handwritten note that Dr. Kersey does not do disability evaluations.

8          Dr. Kersey advises Claimant to continue with anti-inflammatories and "modification

9   of activities."  (*Id.*)  Presumably, the modification of activities would be inconsistent with

10  working as a cashier at Walgreen's.  Dr. Kersey suggests injections to reduce pain, even

11  though the injections will not improve the knee mechanically.  (*Id.*)  Once again, Claimant

12  declined surgery, as she had consistently done so. (TR. 207).

13         On October 10, 2002, Claimant had an office visit with Mark A. Wolfson, M.D. (TR.

14  216).  Claimant told Dr. Wolfson she had been seen in the emergency room on August 14,

15  2002, and diagnosed with degenerative joint disease of the right knee.  She complained that

16  she "can't do her job at work."  (*Id.*)  Dr. Wolfson wrote a work restriction:

17         Mrs. Kolep has severe osteoarthritis of her (right) knee that
           precludes her from doing any prolonged standing or walking.
18  (*Id.*)

19         The RFC physicians and the ALJ incorrectly attach significance to several aspects of

20  Dr. Kersey's reports.  First is the premise that Dr. Kersey determined that she could return

21  to work at Walgreen's in two weeks, but Claimant wrongfully refused to go back to work.

22  Dr. Kersey's original plan on August 22, 2002, obviously assumed that with two weeks of

23  rest, Claimant's exacerbated level of pain would return to the prior level of pain where the

24  'on your feet all day work' had been tolerated.  It is undisputed this never happened.  No one,

25  including Dr. Kersey, suggests that Claimant has ever been physically able to return to work

26  at Walgreen's since August 18, 2002.  Therefore, Dr. Kersey's plan that Claimant could return

27  to work in two weeks is not medical evidence contradicting Dr. Goedecke's opinion.  In fact,

28  it is not medical evidence at all, but rather a plan that was refuted by Dr. Kersey's September

30, 2002, exam; Dr. Wolfson's October 10, 2002, exam and prescribed work restriction; and all the conclusions of the RFC doctors and the ALJ since then.

Secondly, is the notion that Claimant "was allowed back to work but wanted letter of total disability which was refused." (TR. 257); (TR. 27). Dr. Kersey did not refuse to write an evaluation determining Claimant to be totally disabled because he thought that was false. Rather, Dr. Kersey, as a matter of policy, declines to do disability evaluations. Dr. Kersey suggested to Claimant that she see a physician who would conduct the disability evaluation. There is no legitimate inference from the supposed "refusal" to do a disability letter that contradicts Dr. Goedecke's opinion.

Thirdly, Dr. Shallenberger, who is relied upon so heavily by the ALJ, finds fault with Claimant's refusal of surgery or medically invasive interventions. The injections are a potential response to pain, but do not respond to the DJD or patella dislocation. The record is not clear how long the injections could be pursued. Nothing in the record indicates that Claimant was unreasonable in declining the injections. Regarding surgery, Dr. Kersey stated that knee orthroplasty might be an option in the future, "however, her chronic patella dislocation would represent a significant surgical challenge." (TR 289). Claimant's refusal to have surgery is a reasonable choice and in no way implies that her symptoms are less than reported. The decision to decline injections and surgery is not inconsistent with Dr. Goedecke's findings.

Dr. Kersey's letter to Claimant's attorney emphasizes how serious Claimant's condition is and how it would have gradually worsened over time.

> Her advanced knee osteoarthritis and chronic knee patella dislocation represent a significant problem, and the symptoms that she described with more advanced activities are consistent with her degree of findings on physical exam, as well as on the radiographs. As with most people with degenerative changes, these tend to slowly progress over time. People in this situation often have a great deal of difficulty with stairs, steps, inclines, walking for a prolonged distance, or even sometimes standing for a prolonged period of time. Because of her chronic patella dislocation, she is prone to having significant weakness in her knees, and these symptoms can be severe enough to inhibit activities of daily living. People often need walking aids and sometimes surgical intervention in the future, including a knee

> arthroplasty, however, her chronic patella dislocation would represent a significant surgical challenge. Other treatments for chronic osteoarthritis would be anti-inflammatories, modification of activity, and injections.

(*Id.*)   These severe findings are not inconsistent with Dr. Goedecke's conclusion that Claimant cannot maintain sustained work.

Since Dr. Kersey, Dr. Wolfson and Dr. Behra all have made findings consistent with Dr. Goedecke, the ALJ must have compared the credibility of the findings of the RFC physicians with that of Dr. Goedecke. As a treating physician, Dr. Goedecke's opinions are entitled to great weight. *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989). If the treating physician's opinion is contradicted by another doctor, the ALJ may reject that opinion only if she provides specific and legitimate reasons supported by substantial evidence in the record. *Lester v. Charter*, 81 F.3d 821, 830 (9th Cir.1995).

The ALJ rejected Dr. Goedecke's opinion in part because it was "conclusory." (TR. 30). Page two and three of Dr. Goedecke's report did involve checking boxes, similar to most of the entries on the two RFC assessments relied upon by the ALJ. It is true that the RFC assessments are much more detailed in the check box options. However, the RFC assessments did not evaluate Claimant's ability to perform work on a regular and sustained basis. This is the only portion of the Dr. Goedecke's opinion that the ALJ disagrees with, and there is no medical opinion directly controverting Dr. Goedecke's conclusions on this point.

The two RFC assessments relied upon by the ALJ controvert the medical record and common sense. Despite the fact that Claimant was unable to squat during her examinations by Dr. Kersey (TR. 206, 207), both RFC assessments determine that she can occasionally kneel, crouch and crawl. (TR. 220, 254). Dr. Shallenberger concluded, without explanation, that claimant was exaggerating her symptoms. (TR. 223). There is no basis for that conclusion as discussed later in this report and recommendation. Dr. Shallenberger noted Claimant's refusal to return to work or have surgery on her knee. (TR. 224). As discussed above, it is undisputed Claimant could not return to her job at Walgreen's and that decision to decline surgery was both a personal one and a reasonable one given the challenges the

1    surgeon would be presented with in her case.

2        The second RFC assessment also challenges Claimant's credibility because she alleged

3    blindness, "but on exam V/A OD - 20/25." (TR. 257). Additionally, he complained about

4    her failure to return to work as directed by Dr. Kersey, a complete mis-evaluation of Dr.

5    Kersey's plan as discussed above. Claimant has never claimed blindness in both eyes and is

6    blind in one eye. To discredit Claimant's credibility on this point is astonishing. Both

7    physicians assigned by the agency to perform RFC assessments discredited Claimant's

8    credibility and report of symptoms with absolutely no basis for doing so and, in the face of

9    substantial medical evidence to support her reported symptoms.

10       In comparison, Dr. Goedecke apparently found Claimant's symptoms to be credible

11   given her repeatedly confirmed medical history. He ultimately concluded that the Claimant,

12   with her severe osteoarthritis of the right knee, chronic patella dislocation, diskogenic disease

13   of lumbar spine, glaucoma and blindness in left eye, borderline intellectual functioning and

14   urinary incontinence, would have moderate limitation on ability to maintain concentration

15   and attention for extended periods of time, and moderately severe limitations due to medical

16   problems on her inability to maintain a regular work week schedule. There is nothing in the

17   record that is inconsistent with this conclusion.

18       For these reasons, it was improper for the ALJ to give greater weight to Dr.

19   Shallenberger's opinion then Dr. Goedecke and it was in error for the ALJ to reject the

20   opinion of the Dr. Goedecke.

21       CREDIBILITY OF PLAINTIFF'S TESTIMONY

22       A claimant who alleges disability based on subjective symptoms "must produce

23   objective medical evidence of an underlying impairment or impairments" and "show that the

24   impairment or combination of impairments could reasonably be expected to (not that it did

25   in fact) produce some degree of symptom." *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th

26   Cir.1996).

27                "The claimant need not produce objective medical evidence of
                 the pain or fatigue itself or the severity thereof...Nor must the
28               claimant produce objective medical evidence of the causal

                                    - 23 -

> relationship between the medically determinable impairment and the symptom...Finally, the claimant need not show that her impairment could reasonably be expected to cause the *severity* of the symptom she has alleged; she need only show that it could reasonably have caused *some* degree of symptom."

*Id.* (emphasis added).  This approach to the evaluation of a claimant's testimony "reflects the highly subjective and idiosyncratic nature of pain and other such symptoms."  *Id.*

Once a claimant makes the required showing "and there is no affirmative evidence suggesting she is malingering, the ALJ may reject the claimant's testimony regarding the severity of her symptoms only if she makes specific findings stating clear and convincing reasons for doing so."  *Id.* at 1283-84.  In evaluating a claimant's testimony, "[T]he ALJ may consider, for example (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities."  *Id.* at 1284.

The ALJ found "that the claimant's allegations concerning her impairments and their impact of being totally precluded from work-related activities are considered not fully credible." (TR. 30).  The ALJ expanded on her reasons for finding that Plaintiff lacked credibility stating, "the claimant's pain and limitations are not fully supported by the objective medical evidence." (*Id.*).  In reaching her conclusion, the ALJ discussed that

> "claimant was persistent in her attempt to have Dr. Kersey state that she could not work and was totally disabled.  However, her requests were declined...Although claimant reported that she had difficulties with alleged panic attacks, she was capable of maintaining normal daily activities.  In fact, a panic disorder was never diagnosed...The evidence also shows that the claimant had glaucoma of the left eye, which could have been treated. However, claimant adamantly refused surgery even if it meant losing all her vision in the left eye."

(TR. 29).

Claimant's credibility is important on three issues: the level of pain she deals with; the restrictions on her activities; and her inability to perform the call center job without assistance.  The ALJ's reasons for discrediting Claimant's testimony are not supported by the

1    record.

2    Early in her decision, the ALJ notes an apparent discrepancy in the date of the

3    reported fall that leads to the emergency room visit. (TR. 26). On Sunday, August 18, 2002,

4    in the emergency room, Claimant reported she fell "last week." (TR. 237-38). Four days

5    later, Claimant told Dr. Kersey that she fell over toys on Saturday, August 17, 2002.(TR.

6    207). To the extent this is a discrepancy, it is not substantial evidence calling into question

7    Claimant's credibility. *Robbins v. Social Security Administration*, 466 F.3d 880, 884 (9th

8    Cir.2006). This is particularly so given Claimant's borderline intellectual functioning.

9    The ALJ refers to the visits to Dr. Kersey relied upon by the State Agency physicians

10   to discredit Claimant's credibility. (TR. 26-27). The misinterpretation of Dr. Kersey's two-

11   week restriction from returning to work and the refusal to issue the total disability letter has

12   been analyzed earlier in this report. The ALJ interpreted Dr. Kersey's September 30, 2002,

13   notes (TR. 206) to conclude that Claimant "had a surgical problem of the right knee which

14   could be relieved with medical intervention," but Claimant refused those interventions. (TR.

15   27). As discussed above, Claimant's conditions are chronic, deteriorating and severe.

16   Injections will not help mechanically, but might alleviate pain. (TR. 206). Surgery as an

17   option is problematic. (TR. 289). Moreover, Claimant has been afraid of surgery since she

18   suffered complications in connection with her hysterectomy. (TR. 72). Claimant's refusal

19   to have surgery does not impact her credibility. The ALJ's conclusion that the right knee

20   problem "could be relieved with medical intervention" grossly overstates Dr. Kersey's

21   conclusion.

22   The ALJ goes on to note Claimant's refusal to have surgery for her glaucoma

23   condition as recommended in February 2003. (TR. 27). The ALJ argues that Claimant could

24   have saved her vision had she had the surgery. (TR. 29). Despite her severe apprehensions,

25   Claimant did have the surgery on her left eye on March 3, 2003. (TR. 89-94, 187). Despite

26   the surgery, Claimant still lost the vision in that eye.

27   Presumably, at the request of Claimant's attorney, Dr. Kersey wrote a letter on

28   October 22, 2003, summarizing his findings and opinions related to his treatment of Claimant

1   a year earlier.  The letter describes Claimant's severe symptoms related to her right knee and

2   her problematic prognosis. (*Supra*., p. 21).  Dr. Kersey concludes his opinion letter stating:

3                   I have not seen Ms. Kolep since September 30, 2002, and it is
                   difficult for me to comment on her specific level of symptoms
4                   and activity at this particular time.

5   (TR. 289).

6           The ALJ makes little reference to the severe objective findings in this letter that would

7   support Claimant's complaints, but twice in her Decision refers to this sentence, as if to imply

8   Dr. Kersey's report does not support Claimant's position.  (TR. 28, 29).  There is no evidence

9   in the record to suggest that Claimant's condition ever in any way improved after August 18,

10  2002.  The ALJ's focus should have been on the body of Dr. Kersey's report, but she instead

11  assigned greater importance to his self-protective, perfunctory closing sentence.

12          The ALJ goes on to conclude, without citation to the record, that Claimant "spends

13  most of her time sitting in a chair but able to do house cleaning."  Claimant testified she had

14  pain when sitting normally because there was still pressure on the knee.  (TR. 20).  She

15  spends most of the day sitting in a recliner, which presumably takes weight and pressure off

16  of the knee.  (TR. 72-73).  Claimant does not go out and shop for groceries or run errands.

17  (TR.73).  Claimant's daughter cleans the house. (*Id.*)  Occasionally, Claimant will wash

18  dishes, but otherwise, her daughter does all the housecleaning. (*Id.*)  The ALJ's conclusion

19  that Claimant performs house cleaning is contradicted by the record.

20          The ALJ observes that although Claimant had recurrent right knee problems for six

21  years, "she did extremely well and was even able to perform activities, including work

22  activities."  (TR. 29).  Claimant certainly did work throughout that period, however, her

23  former employer's lay statement indicates that even back in 1997, Claimant:

24                  ...had a hard time going up and down stairs, could not push a
                   vacuum, could not stand for long periods of time, could not
25                  carry supplies, could not bend to clean cupboards or anything
                   pertaining to getting on hands and knees and could not assist any of
26                  my elderly clients.

27  (TR. 197).  This lay statement is consistent with the medical evidence and the ALJ's own

28  findings.  Therefore, to conclude that Claimant was doing "extremely well" during that six

1   year period improperly ignores this credible lay statement.[5]

2       The ALJ concluded that Claimant was "not fully credible." (TR. 30). In the next two

3   sentences, the ALJ noted that Claimant used a cane and a knee brace and became upset

4   during the hearing. It is not clear whether the ALJ is suggesting these devices and behavior

5   illustrated malingering. Otherwise, these references are superfluous. An Ace wrap for the

6   knee was prescribed at the initial emergency room visit by Dr. Behra. (TR. 239). A knee

7   brace was prescribed by Dr. Goedecke. (TR. 293). Dr. Kersey notes people in Claimant's

8   situation "often need walking aids." (TR. 289). While the second RFC physician noted "use

9   of cane not medically proven" (TR. 253), it is difficult to imagine what more proof is needed.

10  The use of the cane and knee brace does not reflect negatively on Plaintiff's credibility.

11      Plaintiff did become so emotional during the hearing that a recess was required. (TR.

12  90). This occurred when Claimant was asked about losing her sight in her left eye following

13  the March 3, 2003, surgery. Recalling that event would be understandably upsetting. Again,

14  this does not reflect negatively on Claimant's credibility.

15      The ALJ concluded that Claimant's "pain and limitations are not fully supported by

16  the objective medical evidence." (TR. 30). The Claimant has long-standing, severe

17  degenerative joint disorder and chronic patellar dislocation of the right knee. Adding

18  pressure to that condition, Claimant is almost morbidly obese, a factor never discussed or

19  mentioned anywhere in the ALJ's opinion. *Celaya v. Halter*, 332 F.3d 1177 (9th Cir.2003)

20  (holding that the ALJ erred in not determining the effect of claimant's obesity on her other

21  impairments and her ability to work even though claimant failed to raise obesity as a

22  disabling factor); *See Stack v. Barnhart*, 327 F.Supp.2d 1175 (C.D.Cal. 2004) (holding that

23

24      [5]The Commissioner argues that the ALJ is not required to consider lay statements. (Response, p. 6-7).
SSR 88-13 required the ALJ to obtain evidence regarding activities of daily living in cases where the medical
25  evidence did not support Claimant's subjective complaints. In this case, the medical evidence does support
Claimant's subjective complaints, as well as the employer's lay statement. SSR 88-13 was superceded by SSR
26  95-5p. Far from negating the value of lay testimony, when issues concerning the credibility of subjective
complaints of pain arise, SSR 95-5p requires that "careful consideration must be given to any available
27  information about symptoms." The employer's lay statement was valuable information concerning Claimant's
symptoms that was improperly disregarded by the ALJ. *Robbins v. Social Security Administration*, 480 F.3d
28  at 885.

1   the ALJ breached his duty to develop the record by failing to consider claimant's obesity).

2   This Claimant is also blind in one eye, has degenerative disc disease in her lower back, and

3   has urinary incontinence.  Given the cumulation and severity of Claimant's physical

4   symptoms, her claims of pain and physical limitations are credible.

5           The ALJ did not determine that Claimant was malingering and did not identify clear

6   and convincing reasons to reject her testimony.  There is ample objective medical evidence

7   to support Claimant's reports of pain and limitations on physical activity.  It was in error for

8   the ALJ to disregard and discredit Claimant's testimony on these points.

9           VOCATIONAL EXPERT TESTIMONY

10          Plaintiff argues that the ALJ erred in allowing the vocational expert to consider

11  Plaintiff's past relevant work as it was accommodated.  According to SSR 82-61, three tests

12  exist for determining whether or not a claimant retains the capacity to perform her past

13  relevant work.  The first is whether or not the claimant retains the capacity to perform her

14  past relevant work "based on a broad generic, occupational classification of that job." *Id.*

15  The second is whether or not the claimant "retains the capacity to perform the particular

16  functional demands and job duties peculiar to an individual job as he or she actually

17  performed it." *Id.*  The third test is whether the claimant retains the capacity to "perform the

18  functional demands and job duties of the job as ordinarily required by employers throughout

19  the national economy." *Id.*  The ALJ may use any of the three tests and is not required to

20  utilize all three.  In the present case the ALJ utilized both the first test, finding that the

21  Plaintiff retained the capacity to perform her past relevant work based on a broad

22  classification of the job as well as the second test, finding the Plaintiff retained the capacity

23  to perform the demands of her job as it was she had actually performed it.

24          Claimant has twice previously held call center telemarketing jobs.  Claimant asserts

25  that she had difficulties with those jobs, requiring her to be assisted regularly in routine tasks

26  by her supervisors.  Claimant argues that this means that she would not be competitive in

27  these jobs in the future.

28          Claimant completed the ninth grade and started the tenth grade.  (TR. 54).  She states

1   that because of changing foster care placements, she changed schools frequently. (TR. 55).

2   Claimant testified she was in special education courses from the fifth grade on.  (TR. 54).

3   Claimant has never obtained her GED.  (*Id.*)  In the fall of 2003, she was attempting to obtain

4   her GED in classes at Pima Community College, but "an apparent learning disability" was

5   interfering with her ability to successfully complete the program.  (TR. 194).

6          Claimant was at one telemarketing job, Rockwell Holdings, for two months until the

7   company was "closed down for fraud." (TR. 59).  At that job, the manager helped her in and

8   out of the computer sites.  At the other call center job, which Claimant held for about one and

9   a half years, she initially worked taking phone orders (CSR-I), and later moved into customer

10  service responding to customers with order problems (CSR-II). (TR. 61).  She also did filing

11  and paper shredding.  (*Id.*)  Claimant's supervisor, Tamberlin Hall, would have to put

12  Claimant into the correct computer screen to check the order. (*Id.*)  Throughout her call

13  center work, Claimant had trouble navigating between the different computer screens, finding

14  that she could not move between screens without assistance.  (TR. 64).  Claimant reports she

15  was able to type five words per minute and could not come close to meeting the company

16  standards for computer data entry.  (TR. 97).  In her second call center position, Claimant

17  performed unsuccessfully in customer service for one week and then was switched to the

18  listening room, "which was the easiest job there was." (TR. 99).

19         Claimant's testimony concerning these accommodations was not confirmed by co-

20  workers.  However, the claims are credible given her low education, her problems obtaining

21  a GED at Pima Community College, her persistence in the more physically demanding, but

22  lower skilled cashier jobs after the call center jobs, and Dr. Rau's determination of Claimant's

23  intelligence quotient at 79, borderline intellectual functioning.  Also, Claimant's age is such

24  that a lack of familiarity or comfort with computers, particularly given her level of education,

25  would not be unusual.

26         In determining that Claimant could perform her past work as a telemarketer, the ALJ

27  relied particularly on vocational expert Ruth Van Vleet's testimony in response to

28  hypothetical scenarios.  (TR. 29).  Ms. Van Vleet testified that someone with Claimant's

physical limitations, including blindness in the left eye, could perform the CSR-1/CSR-2 telemarketer positions.  (TR. 102).  If moderate ability to concentrate was added to the hypothetical, Ms. Van Vleet concluded the hypothetical person could still perform CSR-1 work.  (TR. 102-103).

In questioning Ms. Van Vleet, the ALJ added to the hypothetical the limited ability to use the computer.  (TR. 103).  A lengthy, somewhat confused, exchange followed.  (TR. 103-104).  Ms. Van Vleet first concluded that with Claimant's lack of proficiency with computers, as described in her testimony[6], "it's not a competitive job so she would not be able to perform in that capacity."  (TR. 103).

Immediately thereafter, the record becomes confused, perhaps due to a tape change. The record reads:

> ALJ: So then would there be any other telemarketing or Call Center type jobs that such a hypothetical person could perform?

[Tape 2]

> By Administrative Law Judge:

> Q.   Let's back up a minute, Ms. Van Vleet.   Could the hypothetical person with the limitations that I described perform the CSR-II job as the Claimant performed it?
> A.   I would have to say yes because [inaudible] CSR-I, then, yes, she could perform in the CS SNELL & WILMER, L.L.P.
> 1 Arizoan Center
> 400 East Van Buren
> Phoenix, Arizona 85004 R-II.

(*Id.*) Since the record is incomplete, it is not clear that the computer use limitations were part of the hypothetical.  That is clarified by Ms. Van Vleet's subsequent testimony.  In response to the ALJ's inquiry concerning what sedentary jobs this hypothetical person could perform, other than those previously performed by Claimant, Ms. Van Vleet responded:

> A.  Okay, if she can't go back – you had asked me a question if she had limited computer use –
> Q.  Right.  Limited ability to use a computer?
> A.  Right.  And what I was going to say was if, in fact, she was not able to perform and needed someone to change the screens,

---

[6]Ms. Van Vleet was in attendance during Claimant's testimony at the hearing.

et cetera, for her, then that would not be competitive.
Q. Well, are there no –
A. I think that's the question --
Q. – telemarketing jobs whatsoever or any Call Center jobs that do not involve computers?
A.  For the most part these days, everybody is switching to computers so –
Q. Well, if a person –
A. You mean like an appointment center –
Q. Yes.
A.  – or like a carpet cleaning company or something small in that nature, jobs like that do become available.  Unfortunately, I don't have those numbers with me today so traditionally what I'm talking about, someone who does telemarketing, that's going to be an issue and, apparently, you add in that additional limitation for an individual having limited use of the computer such as where, I'm assuming, someone would need to change the screen for them on the job, that would not be competitive.  And then you were asking if there were any other jobs an individual with these limitations could do?
Q. Yes?

(TR. 104).

Clearly, Ms. Van Vleet concluded that Claimant's lack of computer proficiency would make the defendant non-competitive for her prior work as a telemarketer.  But this portion of the hypothetical is completely ignored by the ALJ in rendering her opinion.  (TR. 29).  The ALJ does not explain why she disregarded this part of the ALJ opinion.  In considering hypotheticals posed to a vocational expert, "an ALJ is not free to disregard properly supported limitations."  *Robbins*, 466 F.3d at 886.

While it is clear from the vocational expert's testimony that Claimant cannot work as a telemarketer, the ALJ determined that Claimant could perform her past relevant work as a call center telemarketer, as previously performed.  (TR. 31, Finding 8).  Claimant's work at Rockwell Holdings was brief, two to three months, and ill-defined.  She describes her work as a "listener" for a credit-card company that was closed for fraud.  (TR. 81).  The ALJ correctly focused on the CSR-I and CSR-II position at the Call Center in questioning the vocational expert, instead of the Rockwell Holdings job.

In describing her work at the Call Center, Plaintiff maintained that she could only manage to enter two out of fifteen computer screens on her own, and despite training, needed continual assistance with the computer.  (TR. 64-65).  The work of taking orders was done

1   sitting.  But Claimant worked the night shift and "volunteered" to do other work, including

2   filing and paper shredding.  (TR. 62-63).  She would spend five hours a day walking or

3   standing to do the filing and paper shredding.  (*Id.*)  She had to kneel or bend to file and stand

4   to do the paper shredding.  There is some confused testimony that as a CSR-I, she did no

5   filing, but sat all day.  Even if this were true, it is clear that Claimant could not successfully

6   perform the job, and to keep her position she was either assigned or volunteered to do more

7   menial tasks.

8           Since the job Claimant held involved five hours a day of walking or standing and

9   occasional to frequent bending or kneeling for the filing, that job is clearly beyond Claimant's

10  current physical limitations.  Nowhere in the Decision does the ALJ refer to the extended

11  requirements for standing and walking in the job as performed.  At best, the ALJ is relying

12  on six months in a position of receiving calls and performing data entry, a position that

13  obviously ended unsuccessfully for her.

14          The facts of this case are similar to *Henderson v. Barnhart*, 349 F.3d 434 (7th Cir.

15  2003).  In *Henderson*, the ALJ determined the claimant, Henderson, was capable of returning

16  to his previous work as a school bus driver and medical courier driver.  Henderson worked

17  as a school bus driver for six years until his driver's license expired and he flunked the test

18  to get a new one.  Henderson was dismissed from his job as a medical courier because he had

19  a criminal record.  Henderson's physical and medical condition had not worsened

20  significantly since his time as a bus driver. 349 F.3d at 435.

21          Henderson was obese, six feet tall, weighing 300 pounds, thirty-four years old, with

22  a long history of uncontrolled high blood pressure, heart disease, asthma and severe

23  headaches.  Henderson had an IQ in the low 70's and was only semi-literate.  *Id.*

24          The Seventh Circuit Court of Appeals, in an opinion authored by Circuit Judge

25  Posner, determined that on the record, Henderson was incapable of his prior employment.

26  Judge Posner opined:

27                   ... the fact that a person holds down a job doesn't prove that he
                     isn't disabled, because he may have a careless or indulgent
28                   employer or be working beyond his capacity out of desperation.

1   *Id.*

2       Both elements appear to be at play here.  It is unquestionable that Claimant's poor

3   computer skills and slow typing skills do not allow her to be competitive in the Call Center

4   job.  She maintained her job because her supervisors and co-workers were indulgent,

5   assisting her on the most simple tasks with the computer.  Ultimately, Claimant was allowed

6   to keep her job by performing more mundane functions she found physically difficult, but

7   she persevered because of her desperate need for employment.  In this case, it is clear that

8   Claimant cannot return to her prior employment.

9       REMAND

10      The District Court has the discretion to remand this case for an additional hearing or

11  to award benefits.  In cases such as this one, where the ALJ has erroneously failed to give

12  credit to evidence advanced by the claimant, the case is remanded for the award of benefits

13  where:

14          (1) The ALJ has failed to provide legally sufficient reasons for
            rejecting such evidence; (2) there are no outstanding issues that
15          must be resolved before a determination of disability can be
            made; and (3) it is clear from the record that the ALJ would be
16          required to find the claimant disabled were such where such
            evidence credited."

17

18  *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996).  More generally, the Court must

19  consider the likely utility of a further evidentiary hearing when determining whether the

20  remand will be for the award of benefits of the presentation of additional evidence.  *Harman*

21  *v. Apfel*, 203 F.3d 1151, 1158 (9th Cir. 2000).

22      In this case, the ALJ wrongfully rejected the opinion of the treating physician, Dr.

23  Goedecke, without stating specific reasons for doing so.  Moreover, Dr. Goedecke's opinion

24  was consistent with the medical evidence, and his opinion that Claimant could not maintain

25  sustained work was not controverted.

26      The ALJ also found Claimant's testimony not to be credible without specifying what

27  aspects of her testimony were not credible and why.  In this case, there is overwhelming

28  objective medical evidence to support Claimant's complaints of pain and claimed restrictions.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

There are no outstanding issues that need to be determined.  Had the evidence supplied by Claimant and Dr. Goedecke been accorded the appropriate credibility, then it is clear Claimant cannot perform her past relevant work, and the consideration of her claim must proceed to Step 5. At Step 5, the application of the "Grids," 20 C.F.R. Part 404, Subpt. P, App. 2. Table 1, establishes Claimant as "disabled."  (Rule 201.09, closely approaching advanced age[7], limited (completed ninth grade) education, unskilled previous work experience[8], leads to a decision of disabled).  These Medical-Vocational Guidelines go on to provide:

> The adversity of functional restrictions to sedentary work at advanced age (55 and over) for individuals with no relevant past work and have no transferrable skills, warrants a finding of disabled in the absence of the rare situation where the individual has recently completed education which provides a basis for direct entry into skilled sedentary work.

20 CFR Part 404. Subpt. P, App. 2, Sec. 201.00(d).

The record in this case reflects Claimant's recent education attempts have not been successful due to her borderline intellectual functioning.

The Medical-Vocational Guidelines clearly establish Claimant as disabled at Step 5. Further evidentiary hearing would be fruitless and unnecessarily delay the award of benefits. The Claimant, now 58 years old, with a ninth grade education, who has severe degenerative joint disorder and chronic patellar dislocation of the right knee, undoubtedly exacerbated by her obesity, borderline intellectual functioning, blindness in one eye, a bad back, urinary incontinence, gastroesophageal reflux disorder and several, presumably minor, psychological conditions, is clearly not capable of sustained sedentary work.  This case should be remanded for the award of benefits.

---

[7]At the time of the hearing, Claimant was 55 years old, or advanced age.  At the time of her application, she was closely approaching advanced age.

[8]While the call center work was considered semi-skilled, that was because of the required computer skills, which claimant does not have.  The job as performed by Claimant would be considered unskilled. (TR. 99).

**IT IS THE REPORT AND RECOMMENDATION** of this Court, that the District Judge, after her independent review and consideration, enter an order as follows:

1.     **GRANTING** the Motion for Summary Judgment filed by Plaintiff *[Dkt 7]*.

2.     **DENYING** the Cross-Motion For Summary Judge filed by Defendant *[Dkt 10]*.

3.     **REMANDING** the case to the Social Security Administration, reversing the decision of the ALJ and ordering the award of benefits.

Pursuant to 28 U.S.C. § 636(b), any party may file and serve written objections within ten (10) days after being served with a copy of this Report and Recommendation. If objections are not timely filed, the party's right to de novo review may be waived. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir.2003) (en banc), *cert. denied*, 540 U.S. 900 (2003). If objections are filed, the parties should direct them to the District Court by using the following case number: **CV 04-00706-TUC-CKJ**.

The Clerk of the Court is directed to send a copy of this Report and Recommendation to all parties.

DATED this 14th day of December, 2006.

**CHARLES R. PYLE**
**UNITED STATES MAGISTRATE JUDGE**